In re JOSHUA HILL, INC., Debtor.

JOSHUA HILL, INC. and Marc A. Zaid, Plaintiffs,

v.

WHITEMARSH TOWNSHIP AUTHORITY; William J. Carmint, George K. Palmer, Richard M. Lam, and Christian K. Wagner, as members of the Whitemarsh Township Authority Board; Whitemarsh Township; R. Bruce Ferguson, Maryellen Antal, John S. Gabel, Robert Wiser, and Chuck Pellegrini, in their capacity as current members of the Whitemarsh Township Board of Supervisors, Defendants.

Misc. Action No. 96–0092.
Bankruptcy No. 95–17523DAS.
Adversary No. 95–0856DAS.

United States District Court,
E.D. Pennsylvania.

July 11, 1996.

John Adam Kerns, Jr., Philadelphia, PA (Court-appointed Mediator).

Richard D. Orlow, Paoli, PA, Marc A. Zaid, Bala Cynwyd, PA, for Plaintiff.

Anthony R. Sherr, West Conshohocken, PA, A. Victor Meitner, Jr., Broad Axe, PA, for Defendants.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, for United States Trustee.

### ORDER

McGLYNN, Senior District Judge.

AND NOW, this 11th day of July, 1996, it is hereby ORDERED AND DECREED as follows:

1. The Report and Recommendation of Chief Bankruptcy Judge David A. Scholl, dated April 23, 1996, relating to Defendants' Motion for Summary Judgment, and supplemented by Judge Scholl's Memorandum of May 22, 1996 (collectively, "the Report"), is APPROVED and ADOPTED.

2. The Motion of the Defendants for Summary Judgment is GRANTED in part.

3. Counts I, II, III, VI, VIII, X, and XI of the Complaint filed in the Proceeding and certain aspects of Counts IV, V, and XII of the Complaint, as described in the Report, are DISMISSED.

4. Litigation of all of the remaining Counts and claims shall continue to be administered by the Bankruptcy Court pending trial.

### REPORT AND RECOMMENDATIONS OF BANKRUPTCY JUDGE SUR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DAVID A. SCHOLL, Chief Bankruptcy Judge.

#### A. INTRODUCTION

Presently before this court in the above-captioned proceeding ("the Proceeding") is a Motion ("the Motion") of WHITEMARSH

TOWNSHIP AUTHORITY ("the Authority"), WHITEMARSH TOWNSHIP ("the Township"), and their individual members, all of the parties named as defendants in the Proceeding (collectively, "the Defendants"), for summary judgment in their favor as to all of the many claims of JOSHUA HILL, INC. ("the Debtor") and MARC A. ZAID, ESQUIRE ("Zaid," with the Debtor, "the Plaintiffs"), in the Proceeding. The Proceeding arises out of the Debtor's inability to utilize its sole asset, certain real estate situated on Joshua Road in the Township ("the Property"), for Zaid's intended purpose of constructing high-density residential units on the Property. The Plaintiffs attribute their inability to utilize the Property to (1) environmental problems on the Property which they claim were not disclosed to them in violation of warranties provided by the Authority, the seller, in an Agreement of Sale of June 3, 1987 ("the A/S"); and (2) the Township's refusal to allow rezoning for the intended purpose.

The Motion is based on three general types of contentions: (1) the majority of the Plaintiffs' claims are time-barred under the relevant respective statutes of limitations; (2) the Plaintiffs' claims under the Pennsylvania Hazardous Sites Clean–Up Act, 35 P.S. §§ 6020.101, *et seq.* ("the HSCA"), and the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.1, *et seq.* ("the CSL"), must be dismissed for lack of requisite preliminary notice of the claims; and (3) various other theories allegedly rendering specific claims invalid, including governmental immunity.

For the reasons set forth below, we recommend that the district court order that limitations does bar most of the breach of contract claims, specifically Counts III, VI, VIII of the Amended Complaint ("the Complaint"), and certain portions of the tort claims set forth in Counts IV and V of the Complaint. We also submit that the HSCA and CSL claims are barred by the lack of requisite prior notice. Similarly, we believe that the claim in Count X (inverse condemnation) is barred because of the Plaintiffs' failure to follow the procedures set forth in the state Eminent Domain Code. Finally, we also conclude that the claims set forth in

Count XI (Civil Rights Act) ("the CRA") lack merit as a matter of law. We do allow a portion of the Count IV nuisance and Count V trespass claims, certain claims against the Township in its capacity as the alleged tenant of the Property (Counts VII and IX), and Count XII (negligent or fraudulent concealment) to survive. Also unaffected by this Report are two Counts added to the Complaint by amendment, Count XIII (an objection to a proof of claim of the Authority filed on its behalf by the Debtor) and Count XIV (seeking to invalidate an alleged lien placed against the Property by the Township), which are not referenced in the Motion. A status conference is scheduled on May 1, 1996, to discuss potential means of resolving the Proceeding before it is referred to the district court for any necessary jury trial.

## B. FACTUAL AND PROCEDURAL HISTORY

The Debtor filed the underlying Chapter 11 bankruptcy case on September 26, 1995. The Debtor's sole asset is the Property. Although the Plaintiffs filed a praecipe for a writ of summons in a suit initiated against the Defendants in the Court of Common Pleas of Montgomery County, Pennsylvania ("the C.C.P.;" the suit is referenced as "the C.C.P. Suit"), on October 1, 1993, their admitted reason for the filing of this bankruptcy case was to litigate these issues in a forum other than the C.C.P., which they perceived as hostile to their interests.

No creditors of the Debtor or other interested parties have filed any pleadings in the case, except for the actions of the Township and the Authority in defending this Proceeding. A plan of reorganization ("the Plan") and accompanying disclosure statement ("the D/S") were filed by the Debtor on February 20, 1996. The D/S was approved without objection from any creditors on March 20, 1996, and a confirmation hearing on the Plan is scheduled on May 1, 1996.

The Plan is very simple. It contemplates payment of certain compromise sums, the amount being conditional on the date of payment, to the mortgagee of the Property, and full payment to unsecured creditors. These payments are to be funded by the litigation

of the Proceeding. The success of the case, as well as the goal to obtain a federal forum to hear it, is therefore driven by the Proceeding.

The Proceeding was filed on November 7, 1995. The original Complaint set forth 12 separate civil claims, all related to the sale of, and post-sale dealings of the parties pertaining to, the Property, and, except where indicated, against all Defendants. Count I, under the HSCA, seeks recovery of the Plaintiffs' costs of responding to the presence of hazardous substances allegedly located on the Property, including their clearing and remediation. Count II, based on the CSL, seeks an abatement of industrial wastes from the Property's waters. Count III is a claim against the Authority for rescission of the A/S and restitution of other cash expenses relating to the sale of the Property. The Plaintiffs assert claims for nuisance and trespass, respectively, in Counts IV and V, arising out of the alleged presence of waste materials on the Property. Count VI is a claim for breach of provisions in the A/S which required the Authority to provide the buyer with all reports relating to the Premises. In Count VII, the Plaintiffs seek ground rents allegedly due to them under an alleged "Incinerator Lease" of the Property to the Township, dated December 1, 1964, and extending through April 1, 1994 ("the 1964 Lease"). In Count XI, the Plaintiffs set forth a claim under 42 U.S.C. § 1983 of the CRA, alleging that the Defendants have deprived them of the lawful use and peaceful enjoyment of the Property in violation of the fourteenth amendment. Finally, Count XII is a claim against the Township for fraudulent and/or recklessly negligent concealment of information about the Property from the Plaintiffs.

On December 8, 1995, the Defendants responded to the Complaint by filing a Motion to Dismiss all of its Counts under Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7012(b) and Federal Rule of Civil Procedure ("F.R.Civ.P.") 12(b)(6) ("the MTD"), raising many of the same issues reiterated in the instant Motion. After a brief argument on the MTD at a hearing of December 20, 1995, we indicated that we did not believe that any of the issues presented should be resolved on such a motion, although they might be subject to disposition on a motion for summary judgment. We then indicated that we would, and we did, enter an Order of December 21, 1995, denying the MTD without prejudice; allowing either party until February 29, 1996, to file a summary judgment motion; and allowing any opposition to any such motions to be filed by March 22, 1996.[1]

On December 26, 1995, the Plaintiffs filed a Notice of Removal of the C.C.P. Suit to this court, which was docketed at Adversary No. 95–0955 ("Adv. 955"). They also simultaneously filed, for the first time in that action, a complaint in Adv. 955, identical to the Complaint in this Proceeding, except that it already included the amendments described below. This filing was followed by a motion of January 3, 1996, by the Plaintiffs to voluntarily dismiss the Proceeding and transfer the scheduling Order of December 21, 1995, in the Proceeding to Adv. 955. On January 19, 1996, the Defendants filed a motion to remand Adv. 955 to the C.C.P. in accordance with a procedural order of January 2, 1996, requiring any such filing by that date. After a hearing on the motion to voluntarily dismiss the Proceeding on January 31, 1996, that motion was withdrawn and further actions in Adv. 955, including ruling on the motion for remand, were held under advisement pending disposition of the Proceeding. The Plaintiffs have recently filed a motion to consolidate the two proceedings, which is scheduled for a hearing on April 24, 1996. The attempt to replace the Proceeding with Adv. 955 and now the motion to consolidate are obviously attempts to retain the October 1, 1993, filing date of the C.C.P. Suit for purposes of the analysis of the applicable statutes of limitations. For purposes of deciding the limitations issues raised in the Motion before us, we will assume an October 1, 1993, filing date of the claims raised in the Proceeding.

---

1. We encouraged any filings which could have resulted in a summary disposition of any issues because we recognized that, since the Proceeding was non-core and the Defendants had demanded a jury trial, it was unlikely that this court could conduct the trial. *See* page 323 & nn. 3, 4 *infra*.

On February 5, 1996, the Plaintiffs filed a motion to amend the Complaint to add thereto Count XIII and XIV. Count XIII recites an objection to the allowance of a claim for real estate taxes allegedly due to the Township, filed on the Township's behalf by the Plaintiffs.[2] Count XIV is an attempt by the Plaintiffs to invalidate certain alleged tax liens against the Premises. The motion to amend, though mildly opposed by the Defendants, was granted by this court on February 7, 1996.

The Motion in issue was timely filed on February 29, 1996, pursuant to the schedule set forth in the Order of December 21, 1995. Attached thereto are copies of various deposition excerpts, correspondence, and environmental reports in reference to the Property in addition to those attached to the Complaint. The Plaintiffs responded in timely fashion on March 22, 1996, attaching thereto a lengthy affidavit of Zaid, embellished with numerous exhibits consisting mostly of copies of other correspondence and reports.

The following facts were developed in these submissions. On or about June 3, 1987, Zaid, who subsequently assigned his interest to the Debtor, entered into the A/S to purchase the Property from the Authority. The Property, known by all parties to have been used as a landfill until the mid–1970's, was then zoned exclusively for limited industrial use.

The A/S gave the buyer the right to conduct independent tests regarding surface and subsurface soil and groundwater conditions on the Property. It further provided that, if such tests indicated the existence of toxic materials on the premises which were unacceptable to the buyer, then the buyer had the right to cancel the A/S on or before September 1, 1987.

Zaid was given a copy of environmental tests performed by VFL Technology Corporation ("VFL") at the Property in 1984. The Township had retained VFL in response to

concerns raised by the outcome of an earlier investigation performed at the Property in 1984 by Quality Control Laboratory, Inc. ("QC"), at the behest of the National Label Company ("NLC"), an adjacent property owner. Soil samples were taken by VFL in connection with these tests, but the substances present were found to be non-hazardous pursuant to applicable federal guidelines.

Zaid then contracted with VFL for it to perform further environmental tests at the Property. A report of these tests was issued by VFL on September 4, 1987, containing information about the environmental history of the Property as well as results of the tests. This report concluded that there was no evidence of hazardous waste or priority pollutants in any of the samples taken. It did, however, advise that caution be exercised in any construction activities at the Property due to the presence of explosive gas. The study made no determination as to whether groundwater on the site was contaminated.

Zaid thereafter arranged for additional tests to be performed at the Property by Kaselaan & D'Angelo Associates, Inc. ("K & D"). K & D's tests showed, among other things, the presence of methane gas in the soil. However, the tests also found that a substantial buffer lay between the bottom of the trash layer and the groundwater table. After interviewing the Township's engineer and the Authority's secretary about the environmental history of the site, K & D concluded, in its report of January 14, 1988, that the potential for the presence of hazardous substances on the Property was minimal.

In the A/S, the Authority had warranted to Zaid that the Property was "vacant" and that it had no knowledge or notice of any toxic or hazardous substances on the property which might adversely affect the Premises. Specifically, the Authority further warranted that it had no notices indicating non-compliance with any health, environmental or other regulations or laws in its possession, and was aware of no condition or fact, including those

---

2. The assertion of this claim was apparently a misplaced attempt to eliminate the jury trial demand accompanying the Defendants' answer to the Complaint by utilization of a procedure referenced in *In re Light Foundry Associates*, 112 B.R. 134, 137–38 (Bankr.E.D.Pa.1990), as a possible means to attempt to frustrate an opponent's jury demand. Since the claim in Count XIII is a relatively insignificant aspect of the Proceeding, we doubt whether its presence could deny the Defendants of a properly-demanded jury trial on the other Counts in the Proceeding.

related to environmental matters, which would impose material unforseen economic burdens in connection with the buyer's intended use of the Property. It also promised to provide the buyer with all existing soil reports on the Property in its possession.

Settlement took place on October 3, 1988. Approximately eight months later, in June 1989, the Plaintiffs learned for the first time of the QC tests performed for NLC which preceded the Township's 1984 engagement of VFL. The QC tests indicated the presence of lead on the Property site which, the Township claimed but marginally, exceeded the amount deemed allowable by the United States Environmental Protection Agency ("the EPA"). However, a series of letters and memoranda regarding the QC tests revealed that the Township, at the time of these tests, believed their results to be inaccurate and unreliable and, as a result, the Township was not convinced that a definite problem existed.

On July 13, 1989, approximately one month after receiving information about the QC tests and the related documentation, the Township's Board of Supervisors denied the Debtor's rezoning application to construct ten residential units per acre on the Property. Following the Township's denial of this application, Zaid sent a letter to Victor Meitner, Jr., Esquire ("Meitner"), the Solicitor of the Authority, which stated as follows:

> During the course of the public hearings on the rezoning application, I learned about some information concerning the environmental history of the property.... The information suggests the presence of certain hazardous substances on the landfill property. To the extent that this information may be correct and also **to the extent that this information was not disclosed to me by the Whitemarsh Township Authority, this may contravene the spirit and substance of one of the representations contained in the Agreement of Sale,** dated June 3, 1987. Please refer to page 4, paragraph 6(c) of the Agreement of Sale which states "Seller has no knowledge of any toxic or hazardous substance or any hazardous waste having been treated, stored or disposed on or otherwise

deposited in or on the premises ..." (emphasis added).

Zaid concluded the letter by stating that "I am not now asserting, or threatening to assert in the future, any claim against the Authority."

Between 1990 and late 1992, the Plaintiffs approached the Township with various proposals for use of the Property. These included the construction of "flex" industrial buildings; rezoning to allow for townhouses; a golf driving range; and Township recreational use. These proposals were either rejected by the Township or not pursued by the Debtor.

In late 1992, the Debtor approached the law firm of Lesser and Kaplan ("L & K") for zoning advice. L & K, in the course of this engagement, ultimately requested the right to examine all Township and Authority files relating to the Property. On March 5, 1993, as a result of this examination, the Plaintiffs became aware of the following information: (1) monthly reports issued by the Pennsylvania Department of Environmental Resources ("the DER") in 1971 of landfill operations and recurring violations of the environmental laws and DER regulations in those operations; (2) 1959 letters from two industrial firms, one requesting permission to deposit dead animals, organic materials, and trash for incineration and another requesting permission to deposit waste including rubber scrap and heavy grease and oil, at the facility, and responses indicating that permission was granted; (3) a 1959 letter agreeing that the City of Philadelphia would be held harmless from any claims regarding its deposit of miscellaneous trash at the Property site; and (4) the presence of the 1964 Lease, which appeared to require the Township to pay rent to the Authority, taxes, and certain other expenses for operating a landfill at the Property, from the December 1, 1964, date of the Lease through April 1, 1994.

Thereafter, on April 22, 1993, Zaid personally inspected the DER's files in reference to the Property. In this inspection, he discovered 1972 letters to the Authority from the DER threatening enforcement actions due to violations of the environmental laws in the operation of the landfill.

After instituting the C.C.P. Suit, the Debtor granted permission to NLC, then a potential purchaser of the Property, to conduct further tests at the Property. Pursuant thereto, a report was issued by Roy F. Weston, Inc. ("Weston") in 1994 showing the presence of "reportable" conditions of elevated levels of tetrachloroethane ("PCE") and lead in the groundwater. The report recommended that ownership undertake further investigative and cleanup options. The Township replied to such information in a letter dated October 31, 1994, to Zaid stating that "we do not believe that the Assessment establishes that the site has been materially impacted by the landfill or that the landfill is the direct cause of the test results." As a result, no action was taken by the Township in response to Weston's report. However, the Plaintiffs vigorously assert that this report establishes certain levels of contamination which would have come to light, or at least to the Plaintiffs' attention, if the Defendants had made all of the materials in their files relative to the Property known to them prior to settlement.

Finally, in discovery conducted in connection with the Proceeding in February 1996, Zaid obtained thirty (30) boxes of documents relating to the Property, which he contrasts to the four (4) boxes which he received in 1993. The allegedly most relevant information gleaned from these submissions included a 1986 letter from the Township to NLC refusing to let that company dispose trash at the Property because DER would be concerned about disturbing trash pits on the Property; several documents indicating that land adjacent to the Property was also used as a landfill; minutes of a 1959 Authority board meeting where concern was expressed about open public dumping on the Property; various other documents which indicated the Authority's knowledge of violations of the law in operation of the landfill at the Premises in the early 1970's; and certain documents referencing the Debtor's zoning variance, the most significant of which appears to be the alleged failure of the Township's solicitor to communicate to Zaid a statement that the Board cautioned, in 1987, that "nothing could be assumed" about the variance request.

## C. DISCUSSION

1. *SUMMARY JUDGMENT STANDARDS, EMPHASIZING THAT SUMMARY JUDGMENT MAY APPROPRIATELY BE ENTERED ON A LIMITATIONS ISSUE IF THE RESPONDENT IS UNABLE TO ESTABLISH THAT A GENUINE ISSUE OF MATERIAL FACT REGARDING ACCRUAL OF A CAUSE OF ACTION PRECLUDES ENTRY OF JUDGMENT FOR THE MOVANT.*

The general standards for ruling on a motion for summary judgment, from two different perspectives, were presented by us in two decisions arising from the same case, reported as *In re Rosco Investors, L.P.*, 1996 WL 107503 (Bankr.E.D.Pa. March 6, 1996) (motion for partial summary judgment denied) ("*Rosco II*"); and *In re Rosco Investors, L.P.*, 1995 WL 728605 (Bankr.E.D.Pa. Dec. 5, 1995) (motion for partial summary judgment granted in large part) ("*Rosco I*"). In *Rosco I*, we noted that

[t]he Supreme Court has recently issued several decisions interpreting F.R.Civ.P. 56. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "These cases convey the distinct, if not explicit, message that summary judgment is not 'a disfavored procedural shortcut.'" M. Nelken, *One Step Forward Two Steps Back: Summary Judgment After Celotex*, 40 HASTINGS L.REV. 53, 53 (1988) (quoting *Celotex, supra*, 477 U.S. at 327, 106 S.Ct. at 2555). In particularly *Celotex*, the Court emphasizes the consequences of the failure of the party opposing a summary judgment motion to recognize that he "may not stand on the allegations of his pleading." 6 J. MOORE, FEDERAL PRACTICE, ¶ 56.22[2], at 56–767 (2d ed. 1988). Thus, the Court states, in *Celotex*, that "the plain language of Rule 56(a) mandates the entry of summary judgment af-

ter adequate time for discovery and upon motion," against a party who fails to make a showing sufficient to establish "that there is a genuine issue as to any fact which is an element essential to that party's case." 477 U.S. at 322 [106 S.Ct. at 2552].

However, in *Rosco II,* quoting *In re Price,* 1994 WL 142373, at *3–*4 (Bankr.E.D.Pa. April 12, 1994), we cautioned that

"[i]n ruling on a motion for summary judgment, our function is not to weigh the evidence, . . . but rather to determine whether there is any genuine issue as to any material fact. *See Schillachi v. Flying Dutchman Motorcycle Club,* 751 F.Supp. 1169 (E.D.Pa.1990). The evidence of the nonmoving party is to be assumed correct, and all reasonable inferences therefrom are accrued to the benefit of the nonmoving party. *Berner Int'l Corp. v. Mars Sales Co.,* 987 F.2d 975, 978 (3d Cir.1993); and *In re Asbestos School Litigation,* 768 F.Supp. 146, 149 (E.D.Pa.1991). Summary Judgment is to be entered only if, in spite of the foregoing, the court deems that the movant is entitled to relief as a matter of law. . . .

"While the Supreme Court has recently stated that summary judgment is not to be regarded as 'a disfavored procedural short cut,' *Celotex Corp. v. Catrett,* 477 U.S. 317, [327] 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), courts have consistently been cautious in granting summary judgment. Earlier, the Supreme Court stated that 'Rule 56 should be cautiously invoked to the end that parties may always be afforded a trial where there is a bona fide dispute of facts between them.' *Associated Press v. United States,* 326 U.S. 1, 6, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013 (1944). More recent decisions of the Court of Appeals have characterized summary judgment as ' " 'a drastic remedy,' " ' *Hollinger v. Wagner Mining Equipment Co.* 667 F.2d 402, 405 (3d Cir.1981) (quoting *Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir. 1981), in turn quoting *Tomalewski v. State Farm [Life] Insurance Co.,* 494 F.2d 882, 884 (3d Cir.1974)). This court has also similarly characterized the summary judg-

ment procedure. *See In re Leedy Mortgage Co.,* 76 B.R. 440, 445 (Bankr.E.D.Pa. 1987); *In re American International Airways, Inc.,* 74 B.R. 691, 696 (Bankr. E.D.Pa.1987); and *In re H & H Beverage Distributors, Inc.,* 65 B.R. 243, 244 (Bankr. E.D.Pa.1986)."

We conclude from the foregoing that the necessity to resolve any genuine issue of material fact in order to resolve an issue precludes the entry of summary judgment on that issue. However, we further note that, in determining whether there is any genuine issue as to any material fact, an issue is considered "genuine" only if there is sufficient evidence for a jury to find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). A dispute is "material" if it might affect the outcome of the action under the governing law. *Id.* at 256, 106 S.Ct. at 2514. Moreover, mere allegations or denials of the non-moving party will not serve to defeat a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The non-moving party must set forth "specific facts showing that there is a genuine issue for trial," *id.* at 256, 106 S.Ct. at 2514, in response to the movant's assertions. We note that, while Moore states that "summary judgment may be particularly appropriate as to statute of limitation issues," 6 J. MOORE, FEDERAL PRACTICE, ¶ 56.17[58], at 56–606 (2d ed. 1995–96), the text further cautions that, "when . . . a genuine issue of material fact remains, especially as to the time the action accrued, a motion for summary judgment on the basis of the statute of limitations should be denied." *Id.* at 56–609 to 56–610.

2. *THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW ON MOST OF THE PLAINTIFFS' CONTRACT AND TORT CLAIMS ON THE GROUND THAT THE APPLICABLE STATUTES OF LIMITATIONS HAVE EXPIRED.*

Applying the foregoing principles to the Defendants' overarching argument that summary judgment should be granted because

all or most of the Plaintiffs claims are time-barred, we must focus on the general question of whether there exists an issue of material fact as to when the statute of limitations period, as to each of the applicable claims, accrued, or began to run. *See, e.g., Hersh v. Allen Products Co.*, 789 F.2d 230, 232 (3d Cir.1986); and *Mazur v. Merck & Co.*, 742 F.Supp. 239, 248–49 (E.D.Pa.1990).

 The statute of limitations period begins to run "when the cause of action arises, as determined by the occurrence of the final significant event necessary to make a claim suable." *Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Air Brake Co.*, 372 F.2d 18, 20 (3d Cir.1966), *cert. denied*, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967). However, in order to maintain an action, a plaintiff must reasonably be expected to know of the existence of that action. The so-called "discovery rule" provides that the statute begins to run as soon as the plaintiff has discovered or, in exercising reasonable diligence, should have discovered, the injury in question and its cause. *See, e.g., Bohus v. Beloff*, 950 F.2d 919, 924–26 (3d Cir.1991); *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 85, 468 A.2d 468, 471 (1983); and *Glaziers & Glass Workers Union Local No. 252 Annuity Fund v. Janney Montgomery Scott, Inc.*, 155 F.R.D. 97, 100–01 (E.D.Pa.1994). Thus, if, through an affirmative act of fraud or concealment, a defendant causes a plaintiff to relax his vigilance or to deviate from his right of inquiry, then the statute will be tolled until the plaintiff knows, or through reasonable diligence should know, of the claim. *See, e.g., Bohus, supra*, 950 F.2d at 925; *Greenberg v. Tomlin*, 816 F.Supp. 1039, 1057 (E.D.Pa.1993); and *Glaziers & Glass Workers, supra*, 155 F.R.D. at 100. The more specific question, then, for purposes of the present summary judgment determination based on the instant Defendants' statute of limitations arguments, is: does there exist a question of material fact as to when the Plaintiffs knew, or, through reasonable diligence should have known of, the existence of each claim?

*a. Rescission and Restitution (Counts III) and Breach of Contract (Count VI).*

 The Plaintiffs' contractual claims for rescission and restitution (Count III) and breach of contract (Count VI) are subject to a four-year statute of limitations under 42 Pa.C.S. § 5525(1). We stated that we would assume that the record supports the conclusion that the Plaintiffs initiated the pertinent suit against the Defendants in the C.C.P. on October 1, 1993. It follows, therefore, that if the Plaintiffs' "discovery" of claims for rescission and restitution and breach of contract occurred, or should have reasonably occurred, before October 1, 1989, such claims should be time-barred by the applicable statute of limitations.

The claims, as set forth in the Complaint, allege that the Defendants breached specific warranties and representations about the environmental history of the Property, and failed to provide to the Plaintiffs the environmental reports and documents, in violation of the A/S. Such actions, according to the Complaint, constituted a breach of contract and a breach of the warranties provided[3] and, as a result, the Plaintiffs claim to be entitled to damages as well as the rescission of the A/S, the return of the purchase money, and restitution for other cash expenses.

The record clearly indicates that Zaid had actual knowledge that the Property was used as a landfill prior to the signing of the A/S. He also was aware of VFL tests commissioned by the Township in 1984 in which soil samples were found to be non-hazardous. Zaid's general concerns about the condition of the Property prompted him to contract with VFL himself in September 1987, and with K & D in January 1988, to perform further environmental tests at the Property.

In June 1989, Zaid learned of QC tests performed prior to the 1984 VFL test, revealing the presence of lead on the Property. In response to this discovery, Zaid drafted

---

**3.** Although the Plaintiffs did not explicitly set forth a claim of breach of warranty, such a claim is implicit in Count VI, breach of contract, and is governed by the same four-year statute of limitations under 42 Pa.C.S. § 5525(2). *See Clewell v. Upjohn Co.*, 1995 WL 708534, at *6 (E.D.Pa. Nov. 20, 1995).

the letter of July 13, 1989, suggesting that the revelation of such information "may contravene the spirit and substance of one of the representations contained in the Agreement of Sale." Zaid was obviously referring to the Authority's representation that it "had no knowledge of any toxic or hazardous substance or any hazardous waste ... having been ... deposited in or on the premises." *See* A/S, ¶ 6(c). As a result of the statements in the letter, the Defendants claim that June 1989 marks the latest date that the Plaintiffs could be said to have "discovered" the existence of a claim relating to misrepresentations in the A/S.

The Plaintiffs argue, however, that the Defendants' concealment of additional documentary information served to further toll the statute of limitations until at least March 1993, when the Plaintiffs, after retaining counsel, obtained access to additional files and records of the Defendants relative to the Property. They suggest that significant information was concealed from them even until the discovery in connection with the Proceeding was obtained in February 1996. The Plaintiffs contend that it is highly significant that only then did they discover, among other findings, the existence of monthly DER reports of landfill operations and alleged violations of the Pennsylvania Solid Waste Management Act; letters indicating that certain industrial firms had requested and apparently received permission to deposit wastes such as dead animals, rubber scrap, and heavy grease and oil at the facility in 1959; and letters indicating that the City of Philadelphia had also apparently obtained permission to deposit waste at the facility in 1959. In suggesting that the July 13, 1989, letter from Zaid to Meitner did not represent a complete fulfillment of the Defendants' obligations to disclose under the A/S, the Plaintiffs point to the end of the letter when Zaid concludes that "I am not now asserting, or threatening to assert in the future, any claim against the Authority."

As stated previously, discovery occurs, when, in exercising reasonable diligence, a plaintiff should have discovered the existence of an injury. In this instance, the injury is the breach of contract and warranty. In light of Zaid's discovery of the existence of lead on the Premises as revealed in the QC tests, in conjunction with Zaid's letter suggesting that such discovery may contravene the spirit of one of the representations of the A/S, this court finds that the Plaintiffs should have discovered, and, in fact, did discover the existence of potential contract/warranty claims in June 1989, but knowingly and intelligently decided, for reasons probably motivated by an intention to retain good will with the Defendants so as not to preclude reconsideration of the adverse zoning decision, not to pursue.

The fact that Zaid concluded his letter with the statement suggesting that he was not asserting any claim against the Authority does not defeat the notion that Zaid knew of potential misrepresentations relating to the A/S in June 1989. It merely expressed his intention not to act upon this information at that time. Furthermore, the fact that certain information was discovered, in March 1993, which could be used to prove other misrepresentations, does not serve to eliminate any prior "discovery." The test does not hinge on quantity and quality of knowledge, but whether one reasonably should have known of the existence of an injury. Here, the Plaintiff clearly knew of the nature of alleged misrepresentations by the Authority in the A/S as of June 1989.

We should also add that the quantity and quality of the latter discoveries are far from overwhelming. The materials discovered in 1993 and 1996 cannot reasonably be characterized as "smoking guns." They consist of very dated (1959) letters of businesses and municipalities, indicating that permission may have been given, perhaps for a very brief time, to utilize the Property as a depository for certain potentially contaminated items, *e.g.*, dead animals, rubber scrap, and heavy grease and oil. There is no evidence that the Property actually *was* used as a dump by these businesses and municipalities for any significant time, nor is there any connection between the presence of these materials and the findings of the presence of lead and groundwater contamination in the Weston report or any of the other reports pertaining to the Property. The DER viola-

tions date from 1971 and focus almost exclusively upon such issues as the irregular and negligent methods of operation of the site, not complaints regarding the nature of the materials deposited there. The 1972 letters focus on the same type of violations. The absence of later violation reports or letters suggests, if anything, remediation of these conditions. The additional materials gleaned by Zaid from the DER in 1993 and the Defendants in 1996 add no solid evidence to the claim that the Defendants knew of contaminants on the Property. The fact that adjacent property was also a landfill is, at best, a minor addition to the store of knowledge.

In retrospect, we are prompted to query why the Defendants did not supply all of the information later discovered by the Plaintiffs in 1987. The suggestion arises that the Defendants were "hiding something." However, we find it difficult to conclude that any of the letters and reports dredged up by L & K and Zaid in the 1990's are identifiable as significant items that the Defendants knew or should have known should have been supplied to the Plaintiffs under the terms of the A/S. The violations of the laws in operation of the landfill appeared to have ceased in 1972. It is difficult to equate these violations with the warranties which, by the terms of the A/S, would appear to extend only to disclosure of present or recent violations at the Property as of 1987. All significant reports and test results appear to have been disclosed, recalling that only "existing soil reports" were required to be supplied under the terms of the A/S.

We should also note that we are influenced by the apparent access of Zaid to the information discovered in 1993 and 1996 at all times from 1987 forward, as well as the inconclusive nature of the contents of the materials discovered. Zaid is a licensed attorney and a knowledgeable businessman. There is no allegation that the Defendants at any time precluded him from examining all of the Defendants' files which he deemed pertinent, in the same manner as L & K and he himself later did. Thus, the materials discovered were therefore apparently at all times accessible to Zaid, rather than being actively concealed from him.

In light of the foregoing, we have little difficulty in concluding that the record unmistakenly supports the conclusion that "discovery" of all relevant facts occurred or should have occurred outside of the applicable four-year period of time. As a result, we recommend that the Plaintiffs' claims are time-barred under the statute.

We therefore conclude that there is no real genuine issue of material fact as to whether discovery of the facts which reasonably supported the claims under Counts III and VI occurred within the statutory limitations period. The record supports the conclusion that the Plaintiffs in fact had clear access to all relevant facts supporting these claims as of June 1989. We hence recommend that summary judgment be granted in the Defendants' favor with respect to Counts III and VI of the Complaint.

b. *Fraudulent and Negligent Misrepresentation (Count VIII).*

The Plaintiffs' fraudulent and/or negligent misrepresentation claims are governed by the two-year statutory period set forth in 42 Pa.C.S. § 5524(7). The substance of these claims is that false warranties and representations were knowingly made to them by the Authority in the A/S, which caused the Plaintiffs to agree to purchase the Property, and that the Defendants knew or should have known that they "withheld" the provision of reports and notices relative to the Property from the Plaintiffs.

The issue of the accrual of the Plaintiffs' claims under this Count is similar to that considered regarding the Plaintiffs' rescission and restitution and breach of contract claims discussed at pages 310–12 *supra.* These actions occurred in 1988 and the Plaintiffs discovered or should have discovered information sufficient to raise this claim no later than July 1989. Since this claim was asserted more than four (4) years after "discovery" of Defendants' misrepresentation, it is clearly time-barred under the applicable statute of limitations. Since, as in our analysis of the prior claims, we find that no issue of material fact exists as to whether discov-

ery of the claim under Count VIII occurred within the statutory limitations period, we will recommend that summary judgment be granted in favor of the Defendants on this claim.

### c. *Nuisance (Count IV) and Trespass (Count V).*

The limitations period applicable to the Count IV (Nuisance) and Count V (Trespass) claims is that provided in 42 Pa.C.S. §§ 5524(4), (7), which state that such claims must be asserted within two (2) years from the accrual of the claims. We determined, in discussing the Plaintiffs' contract and misrepresentation claims, that, by June 1989, the Plaintiffs had enough knowledge of the presence of environmental issues to constitute "discovery" of potential claims for rescission and restitution, breach of contract, and misrepresentation.

In large part, the claims asserted in Counts IV and V are covered by this ruling and accordingly are barred by limitations. Thus, in Count IV, many of the claims relate to the use of the Property as a landfill and the failure to remove pollutants therefrom. Count V references the release of hazardous and toxic substances on the Property by the Defendants. These claims are all barred unless we accept a later "discovery" date than October 1, 1991. The latest date that we could accept as the date of discovery is June 1989, rendering all of these claims barred.

However, the Plaintiffs assert additional claims in these Counts. In Count IV, they also reference a failure of the Defendants to presently abate the nuisance which the Plaintiffs allege that the Defendants previously created. In Count V, the Plaintiffs reference a continuing trespass due to the alleged continued presence of hazardous and toxic substances on the Premises. These allegations suggest that the alleged improper tortious conduct and the effects of such conduct "continued" to a point within the limitations period.

The notion of a "continuing" tort was addressed in somewhat similar circumstances in *Jensen v. General Electric Co.,* 182 A.D.2d 903, 581 N.Y.S.2d 917 (1992). There, the plaintiffs owned a piece of property that was located near a former industrial site of the defendant. The site contained hazardous industrial waste that had been dumped there in the early 1960's. In 1984, a report revealed that the groundwater beneath the site contained contaminants which were "migrating away from the site and creating a plume of water contamination in the surrounding properties." *Id.* at 918, 581 N.Y.S.2d 917. More than three (3) years after being informed of this hazardous condition, the plaintiffs commenced an action asserting, among other things, "continuing trespass" and "continuing nuisance." The court held that, although these causes of action were subject to a three-year statute of limitations, the facts suggested that the claims involved "recurring wrongs" which were not subject to any statute of limitations because they "constantly accrue, thus giving rise to successive causes of action." *Id.*

Other courts, faced with similar facts, have been more reluctant to recognize the existence of a "continuing" tort. In *Piccolini v. Simon's Wrecking,* 686 F.Supp. 1063 (M.D.Pa.1988), the property in question was located adjacent to an old landfill. As a result of the migration of contaminants that were deposited at the landfill, the surrounding environment, including the soil, air and water were allegedly contaminated. The plaintiffs claimed that the situation constituted a continuing tort, arguing that "the Defendants created a continuing discharge of contaminants via surface waters onto Plaintiff's land ..., and that Defendants had breached a legal duty in failing to take action to remedy the condition." *Id.* at 1076.

In presenting this issue, the plaintiffs cited to the 1 RESTATEMENT (SECOND) OF TORTS, § 161, Comment (b), at 289–90 (1965) ("1 Restatement"), which states as follows:

*Continuing Trespass.* The actor's failure to remove from land in the possession of another a thing which he has tortiously ... placed on the land constitutes a continuing trespass for the entire time during which the thing on the land ... and confers on the possessor of the land an option to maintain a succession of actions based on a

theory of continuing trespass or to treat continuance of the thing on the land as an aggravation of the original trespass.

*Piccolini, supra,* 686 F.Supp. at 1075.

The defendants, however, contended that the latest possible date for disposal of waste at the site would have been in 1979. They argued that the disposal caused a *permanent* effect on the land which could be distinguished from a *continuing* effect. They cited the following section of the Restatement:

A continuing trespass must be distinguished from a trespass which permanently changes the physical condition of the land. Thus, if one, without a privilege to do so, enters the land of which another is in possession and destroys or moves a structure standing upon the land, or digs a well or makes some other excavation or removes earth or some other substance from he land, the fact that the harm thus occasioned on the land is a continuing harm does not subject the actor to liability for a continuing trespass. Since this conduct has once and for all produced permanent injury to the land, the possessor's right is to full redress in a single action for trespass, and a subsequent transfer of the land, as such, acquires no cause of action for the alteration of the condition of land.

1 Restatement, *supra,* § 162, comment (3), at 293.

The *Piccolini* court, in analyzing both parties' arguments, recognized that the issue of whether an injury is permanent is not easily resolved. The court noted several cases where the injury was permanent, as when structures or other objects that could not be readily removed constituted the nuisance. *Id.* at 1077. It also noted other cases which required the defendants to be continually at fault to find that a tort was continuous. *Id.,* citing *Baker v. F & F Investments,* 420 F.2d 1191 (7th Cir.1970). It further referenced cases suggesting that a continuing tort existed where a nuisance or trespass could be legally abated, and, therefore, where it was held that a recovery could be had for all such damages as have accrued within the statutory period before the action. *Id.,* citing *Reynolds Metals Co. v. Yturbide,* 258 F.2d 321 (9th Cir.), *cert. denied,* 358 U.S. 840, 79 S.Ct.

66, 3 L.Ed.2d 76 (1958); *Signal Mountain Portland Cement Co. v. Brown,* 141 F.2d 471 (6th Cir.1944); and *Daigle v. Continental Oil Co.,* 277 F.Supp. 875 (W.D.La.1967).

At the conclusion of its decision, the *Piccolini* court acknowledged the fact that "there is a wide divergence among the courts as to the proper legal standards [with regard to the issue of permanent versus continuing torts], and there appears to be little in Pennsylvania law to guide the court." The court, therefore, denied a motion for summary judgment in order that more discovery could be conducted prior to the rendering of a decision.

Factually, this case can be distinguished from both of the two cases described above in one respect. In *Jensen* and *Piccolini,* hazardous contaminants were continually migrating from a neighboring industrial site or landfill onto the respective plaintiffs' lands. Here, the toxic substances that the Plaintiffs claim are depriving them of the enjoyable use of the Property have not come as a result of a migration from neighboring lands. The facts suggest that they were originally disposed of on, and hence were generated by, the Property itself. In essence, it has been the *effects* of the *permanent presence* of hazardous substances on the Property that has been continuing. However, we find that this distinction is immaterial, and that therefore these aspects of Counts IV and V alleging continuing torts cannot be stricken in the context of the instant Motion.

Courts have found that, in cases involving trespass, "[i]f a trespass is followed by injury constituting a continuing nuisance, the damages for the original trespass must be recovered in one action[. However,] successive actions may be brought to recover damages for the continuation of the wrongful conditions, and in these the damages are estimated only to the date of the bringing of each suit, and the statute of limitations does not begin to run from the date of the original trespass." 75 AM.JUR.2d 155 (1991), citing *Doran v. Seattle,* 24 Wash. 182, 64 P. 230 (1901). *See, also, Ford v. International Harvester Company,* 399 F.2d 749, 752 (9th Cir. 1968); and *Lindquist v. Mullen,* 45 Wash.2d

675, 277 P.2d 724 (1954). By way of contrast, where an invasion of one's property is considered to be "continuing," a recovery may be had for all such damages as have accrued within the statutory period before the action. *See* 58 AM.JUR.2d 901 (1975); and 75 AM. JUR.2d, *supra*, at 154–55. The Plaintiffs are therefore barred from recovery of damages accruing on these claims prior to October 1, 1991, but not from recovering damages for the Defendants' failure to abate the alleged nuisance or remove the hazardous substances therefrom thereafter. It may be very difficult for the Plaintiffs to isolate such damages, or to quantify what such damages might be. However, they cannot be barred on the basis of limitations.

### d. *Civil Rights Act (Count XI)*.

The precise nature of the claims of the Plaintiffs under the CRA, 42 U.S.C. § 1983, are not set forth very clearly in the Complaint. The Complaint merely incorporates the allegations of the previous ten (10) Counts and then states, without elaboration, that the Defendants' "policy or custom" deprived them of fourteenth amendment rights.

In their brief in opposition to the Motion, the Plaintiffs provide mere elucidation of their CRA claims. These claims are said to arise from the Defendants' failure to agree to the proposed zoning changes to the Property, specifically for the use of the Property as a golf driving range; the failure to identify the Township as a tenant of the Property under the 1964 Lease; the issuance of certain citations against the Plaintiffs in reference to the Property; and the collection of taxes on the Property which the Township now sought to enforce by municipal liens.

 With respect to the statute of limitations applicable to the Plaintiffs' CRA claims, we begin by noting that Congress did not provide for a statute of limitations for civil rights claims under 42 U.S.C. § 1983. When Congress does not so provide for a time limitation for a federal cause of action, a local time limitation for comparable state law claims will be adopted as the applicable limitations period. *See Wilson v. Garcia*, 471 U.S. 261, 266, 105 S.Ct. 1938, 1941–42, 85 L.Ed.2d 254 (1985). The Supreme Court has held that 42 U.S.C. § 1988 directs federal courts to select the "most appropriate," or "most analogous" state statute of limitations to apply to § 1983 claims. *Id.* at 268, 105 S.Ct. at 1942. In *Springfield Township School Dist. v. Knoll*, 471 U.S. 288, 289, 105 S.Ct. 2065, 2065, 85 L.Ed.2d 275 (1985), the Court held that § 1983 claims involving the deprivation of life, liberty or property were most analogous to personal injury actions and, thus, the applicable state's statute of limitations for personal injury actions should apply. Accordingly, claims such as the instant claims brought under 42 U.S.C. § 1983 in Pennsylvania have been given a two-year statute of limitations pursuant to 42 Pa. C.S.A. § 5524(7). *See Bougher v. University of Pittsburgh*, 882 F.2d 74 (3d Cir.1989). Thus, a two-year statutory period of limitations applies to the claims set forth in Count XI.

To the extent that the CRA claims refer to actions which occurred prior to October 1, 1991, they are therefore barred by limitations. Falling within this category would be claims arising from the Defendants' original refusal to rezone the Property in 1989. However, in light of our subsequent determination that none of the Plaintiffs' CRA claims identify any irrational, partisan basis for the zoning decisions, or identify a "policy or custom" of the Defendants which damaged the Plaintiffs, the Plaintiffs' CRA claims must be dismissed in any event. *See* pages 320–21 *infra.* Hence, any further discussion of limitations regarding these claims, and what specific claims limitations might bar, is unnecessary.

### e. *Fraudulent and/or Recklessly Negligent Concealment (Count XII)*.

 The facts clearly indicate that a number of documents relative to the Property which were at all times in the possession of the Defendants were subsequently discovered by the Plaintiffs in March 1993 and February 1996. Such documents include (1) DER reports of violations in the landfill operations on the Property; (2) letters from various businesses requesting permission to deposit certain industrial waste on the Property; (3) letters requesting permission to

dispose of waste on the Property from the City of Philadelphia; and (4) the 1964 Lease between the Township and the Authority evidencing the Township's status as exclusive tenant of the Premises with the power to deny others from use of the Premises until the termination of the Lease. Upon discovery of such documents, the Plaintiffs learned of facts which filled out the environmental history of the Property, and relevant details concerning the Township's tenancy and powers under the 1964 Lease. The undisputed failure of the Plaintiffs to discover such documents until March 1993, as well as additional information discovered subsequent to such date, indicates that a claim brought for fraudulent or negligent concealment relating to such information was successfully brought within the two-year statutory period under 42 Pa.C.S. § 5524(7). Although the Plaintiffs may have difficulty proving that discovery of these documents alone caused substantial damages, when their related contract and tort claims are barred by limitations, *see* pages 310–13 *supra*, that fact would not appear to bar this claim, at least on the basis of limitations.

### f. *Action for Ground Rents (Count VII) and Breach of Lease (Count IX).*

▮ The Counts in the Complaint referencing breaches of the terms of the 1964 Lease are governed by the four-year statute of limitations as set forth in 42 Pa.C.S. § 5525(1). There appears to be little doubt that this four-year statute had not expired when the Plaintiffs initiated their claims on the ground lease, and for breach of the 1964 Lease, because "discovery" of the facts relevant to these claims did not occur until March 1993. It was not until March 1993 that the Plaintiffs allegedly learned that (1) the Property was under lease to the Township until 1994; (2) the Township was allegedly obligated to pay taxes and take certain other actions, including restoration of the Property to its pre-Lease condition upon expiration of the Lease; and (3) the Township was obligated to pay rent to the Authority under the Lease. Unlike the claims regarding the condition of the Property, there is no evidence that the Plaintiffs had any facts at their disposal which would have led them to

anticipate the existence of these claims prior to March 1993. The Defendants' apparent arguments that certain facts not established in the record render these claims *de minimis* have no relevance to the issue of limitations.

We might add that none of the other arguments of the Defendants support the granting of summary judgment in their favor on these claims, and therefore we will not discuss these claims further, except to note that the Motion must be denied as to them. We also note that no limitations argument is addressed by the Defendants as to the claims set forth in Counts I (HSCA), II (CSL), X (inverse condemnation), XIII (objection to the Township's claim), or XIV (avoidance of Township's lien). In fact, since the Motion makes no mention of any sort to Counts XIII and XIV, we need not discuss these claims further except to note that these claims are not affected by the Motion.

3. *THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE HSCA AND CSL CLAIMS DUE TO THE PLAINTIFFS' FAILURE TO PROVIDE THE RESPECTIVE REQUISITE 60–DAY PRIOR NOTICES.*

▮ The HSCA provides, at 35 P.S. § 6020–1115(b), that

> [n]o action may be commenced under this section prior to 60 days after the plaintiff has given notice to the department, to the host municipality and to the alleged violator of this act, or of any regulations or orders of the department under this act;
> . . .

Similarly, the CSL provides, at 35 P.S. § 691.601(e), that

> [n]o action pursuant to this section may be commenced prior to sixty days after the plaintiff has given notice in writing of the violation to the department and to any alleged violator.

The Plaintiffs respond to the Defendants' allegations, in the Motion, that the requisite notices have not been provided only by stating (1) the Defendants received copies of the Weston report, which allegedly "constituted" the requisite notices under both laws; and

(2) the discussion in *Smith v. Weaver*, 445 Pa.Super. 461, 477, 665 A.2d 1215, 1223 (1995), supports the "notion that notice may not be required in all circumstances" and that the notice provisions may be liberally construed, "especially when constructive notice has been received."

The Plaintiffs' failure to respond by producing any evidence that any specific pre-litigation notices were in fact provided by them allows us to conclude, under the principles set forth at pages 308–09 *supra*, that, for purposes of this Motion, no such notices were in fact sent by them.

The Defendants' receipt of the Weston report was, in our view, in no sense tantamount to receipt of notice that specific conditions existed on the Property which supported the commencement of any action against the Defendants under the HSCA or the CSL. The Weston report was merely another in the series of reports concerning the condition of the Property which have been generated over the years. Moreover, there is no evidence that any notice whatsoever, even dispatch of the Weston report, was ever provided to the *DER* concerning the commencement of this action, as is required by both 35 P.S. § 6010.1115(b) and 35 P.S. § 691.601(b). This failure frustrated entirely

> [t]he obvious purpose of the provision … to afford the Attorney General opportunity exercise, if he deems it necessary, his high prerogative to take over control or supersede counsel in [such] actions. …

*Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co.*, 367 Pa. 40, 57–58, 79 A.2d 439, 448 (1951).

The *Smith* case identifies another purpose of the CSL notice as "to bring about a prompt cleanup" of the waters in issue. 445 Pa.Super. at 477, 665 A.2d at 1223. It notes that this purpose is not served when the cleanup is being done by another party, or where there is an imminent threat of harm to the safety of the plaintiff, or when the contemporary involvement of the DER in the matter at issue indicates its obvious awareness of the conditions at issue. None of these circumstances are present here. No party is engaged in a present cleanup of any

kind at the Property. There is no allegation of dumping of any materials, let alone hazardous waste, on the Property for over twenty (20) years, and hence of any imminent threat of harm created by the continuous conditions of the Property to anybody. There is no evidence that the DER has not shown any recent interest in the Property. Thus, it is clear that none of the exceptional circumstances cited in *Smith* as justification for waiver of the notice requirements exist here.

Therefore, we recommend that the Plaintiffs' HSCA and CSL claims are barred from remaining as valid claims in the Proceeding at this juncture.

4. *THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE SUBSTANTIVELY-WEAK INVERSE CONDEMNATION CLAIM BECAUSE OF THE PLAINTIFFS' FAILURE TO FOLLOW THE PROCEDURES SET FORTH IN THE PENNSYLVANIA EMINENT DOMAIN CODE.*

"Inverse condemnation" has been characterized as an action or eminent domain proceeding initiated by a property owner as opposed to the putative condemnor. 27 AM. JUR.2d 411 (1966). Often, such a claim is raised where private property has been taken for public use without formal condemnation proceedings and where it appears that there is no intention of the taker to bring such proceedings. *Id.* An action in inverse condemnation is also available where property is taken for a public use by a municipality having the power to exercise eminent domain, but no statute affords an adequate remedy to the owner of the property to receive just compensation. *Id.*

The law of inverse condemnation is therefore merely an aspect of the law of eminent domain, which involves direct condemnation. *See Marin Municipal Water District v. City of Mill Valley*, 202 Cal. App.3d 1161, 249 Cal.Rptr. 469, 470–71 (1988). "Both are procedural devices for insuring that the Constitutional requirement of just compensation for takings of private

property is not violated." 249 Cal.Rptr. at 471. "The principles which affect the parties' rights in both actions are the same." *Id.*

■ However, inverse condemnation is not exactly the "mirror image" of eminent domain. In eminent domain cases, a public entity has failed to compensate for an *intentional* taking. On the other hand, most inverse condemnation actions arise out of *unintentional* and *negligent* damage to an owner's property or property interest. Such damage often occurs as a result of (1) the construction of public works; (2) an abutter's right to ingress and egress to and from a public street damaged by an improvement in a roadway; (3) flood damages to an owner's property caused by negligent planning and construction of a bank or wall on a flood control project; or (4) damages to homes resulting from a brush fire caused by sparks from electrical transmission lines. *See Rose v. City of Coalinga*, 190 Cal.App.3d 1627, 236 Cal.Rptr. 124, 127 (1987).

In *Yue v. City of Auburn*, 3 Cal.App.4th 751, 4 Cal.Rptr.2d 653 (1992), for example, a restaurant and bar was damaged by flooding and excessive water caused by a poorly-engineered drainage system. The City of Auburn had participated in the construction and design of drainage facilities in connection with an upstream development project. It failed to require the developer to mitigate the storm water runoff, and it failed to upgrade its drainage facilities. The court held that an owner of private property "may recover in an inverse condemnation action where actual physical damage is caused to his property by a public improvement as deliberately planned and built, whether or not damage is foreseeable." 4 Cal.Rptr. at 657. "There is no reason why the economic cost incident to the expulsion of surface water should be borne by the adjoining landowners, rather than by those undertaking such projects for profit." *Id.* 4 Cal.Rptr.2d at 659.

*Marin Municipal, supra,* resulted in a similar decision in an action for inverse condemnation brought after damages resulted from a city's failure to maintain its water pipes. The court in *Marin Municipal* held that, "when the public entity fails to construct or maintain its improvement properly, it takes a calculated risk that damage to private property may occur ... [and thus,] it is proper to require the entity that took the risk to bear the loss when damage occurs." 249 Cal.Rptr. at 472.

■ An action in inverse condemnation may arise as a result of a nuisance created by an entity holding the power of eminent domain. In *Green Acres Land & Cattle Co. v. State,* 766 S.W.2d 649 (Mo.App.1988), the state-owned land for the preservation of wildlife and wetlands. The plaintiff complained that the thousands of waterfowl which had migrated to the state-owned land had caused damages to crops on the plaintiff's land. The plaintiff therefore filed an action for inverse condemnation arguing that (1) the plaintiff's property was taken; (2) the property was damaged by the state; (3) the damage came as a result of public use; and (4) just compensation was not provided. The court held that the state had not exercised any control over the plaintiff's lands, and that the injury was incident to the Plaintiff's own operation on its own land. It reasoned, however, that "damage to private property in the nature of a nuisance creates a cause of action sounding in inverse condemnation when the nuisance is operated by an entity holding the power of eminent domain." *Id.* at 651. In determining whether a nuisance, in fact, existed, the court looked to see if an unreasonable, unusual or unnatural use of the state's property served to substantially impair the right of the plaintiff to peacefully enjoy his property. The court found that the maintenance and management of the wildlife preserve was a reasonable exercise of the state's constitutional authority. It thus affirmed the lower court's dismissal of the plaintiff's petition.

■ In addition to instances involving a nuisance, courts have also recognized that actions in inverse condemnation may arise when an entity cloaked with the power of eminent domain causes a continuous permanent trespass to occur. In *Tuffley v. City of Syracuse,* 82 A.D.2d 110, 442 N.Y.S.2d 326 (1981), an underground culvert caved in under the foundation of a building which was being constructed by plaintiff on his property

in the City of Syracuse. The plaintiff asserted causes of action for trespass and negligence against the City for issuing him a building permit without warning the plaintiff about the existence of the underground culvert. The lower court found that the City had breached its duty and misled the plaintiff into believing that the only sewer under his property was a sanitary sewer which was well away from the actual building site. The court held that a continuous and permanent trespass by a municipality constitutes a *de facto* constructive taking.

 In Pennsylvania, the Eminent Domain Code provides relief for a *"de facto* taking" in 26 P.S. § 1–502(e), which reads as follows:

If there has been a compensable injury suffered and no declaration of taking therefor has been filed, a condemnee may file a petition for the appointment of viewers substantially in the form provided for in subsection (a) of this section, setting forth such injury.

Section 26 P.S. § 1–502(a) thusly sets forth the requirements of the petition:

(a) The condemnee may file a petition requesting the appointment of viewers, setting forth:

(1) A caption which shall be the caption of the proceeding substantially as set forth in the declaration of taking, with an identification of the petitioner and his property. The petitioner shall be designated as the plaintiff. Except as otherwise ordered by the court, the viewers' proceedings shall be at the same court term and number as the declaration of taking.

(2) The date of the filing of the declaration of taking and whether any preliminary objections thereto have been filed and remain undisposed of.

(3) The name of the condemnor.

(4) The names and addresses of all condemnees and mortgagees known to the petitioner to have an interest in his property and the nature of their interests.

(5) A brief description of his property which may include any or all of his properties in the same county taken, injured or destroyed for the same purpose by the condemnor, whether by the same or separate declarations or without a declaration of taking.

(6) A request for the appointment of viewers to ascertain just compensation.

 The Pennsylvania courts have held that *de facto* taking, or inverse condemnation, occurs "whenever 'the entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property.'" *Zettlemoyer v. Transcontinental Gas Pipeline Corp.*, 540 Pa. 337, 343, 657 A.2d 920, 923 (1995), quoting *Redevelopment Authority of Oil City v. Woodring*, 498 Pa. 180, 185, 445 A.2d 724, 726–27 (1982), quoting in turn *Griggs v. Allegheny County*, 402 Pa. 411, 414, 168 A.2d 123 (1961), *rev'd on other grounds*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). The requisite "substantial deprivation" to constitute a *de facto* taking must be (1) occasioned by actions of the entity clothed with the power of eminent domain; (2) caused as a result of exercise of that power; and (3) result in damages which are immediate, necessary, and an unavoidable consequence of that exercise of power. *Darlington v. County of Chester*, 147 Pa.Cmwlth. 177, 183, 607 A.2d 315, 318 (1992). "[E]ach case turns on its unique factual matrix." *Id.*, 147 Pa. Cmwlth. at 184, 607 A.2d at 318.

In *Greger v. Canton Township*, 41 Pa. Cmwlth. 20, 399 A.2d 138 (1979), for example, landowners brought an action against city, township and state Department of Transportation, based upon an alleged *de facto* taking. The Township had allegedly permitted the installation of septic tanks on properties too small to accommodate them. Furthermore, the Township did not properly maintain a particular Avenue adjacent to the plaintiff's property. Thus, the plaintiff's land became flooded with sewage and excess water. The court acknowledged that, if the flooding of land and buildings were the direct and necessary consequence of the Township's drainage plan, there would be a *de facto* taking by the Township. 41 Pa.Cmwlth. at 25, 399 A.2d at 140.

In determining whether a *de facto* taking exists, courts focus on the nature of the

municipality's acts. Where, as in *Greger, supra,* a purposeful and deliberate drainage plan, on the part of the Township, was found, courts are more likely to find a *de facto* taking. On the other hand, where a township unlawfully issued building permits, improperly approved a subdivision or wrongfully contributed to the design of drainage plans, and flooding occurred, a recovery would not lie in eminent domain. Such acts are in no manner "related or incidental to the Township's condemnation powers." *Appeal of Jacobs,* 55 Pa.Cmwlth. 142, 146, 423 A.2d 442, 443 (1980).

In Count X of the instant Complaint, the Plaintiffs appear to aver only that the Defendants effected inverse condemnation or a *de facto* taking of the Property because the Defendants have continued to utilize the Property as a "repository" for municipal and other waste. If these averments are intended to convey a claim that the Property is still used as a landfill, we find no evidence in the record to support same. If they are meant to convey a restatement of the claim for the past use of the Property as a landfill, then the Plaintiffs would apparently be confined to a trespass action. *See Elser v. Commonwealth, Dep't of Transp.,* 651 A.2d 567 (Pa. Cmwlth.1994); and *Borough of Dickson City v. Malley,* 94 Pa.Cmwlth. 386, 503 A.2d 1035 (1986). However, any such action has already been determined to be barred by limitations. *See* pages 312–13 *supra.* Finally, if the Plaintiffs also mean to assert a claim based on the adverse zoning rulings of the Defendants, these claims are not particularly strong either. *See* pages 320–21 *infra.*

One thing is clear, however. The Plaintiffs have not responded to the Defendants' averments, in their Motion, that the Plaintiffs have taken no steps to obtain the appointment of a board of viewers to hear their *de facto* eminent domain claims. In fact, they do not address Count X in their reply to the Motion at all.

The Plaintiffs, however, must assert such a claim in accordance with 26 Pa.C.S. §§ 1–502(e), 1–502(a). They were obliged to petition for the appointment of a board of viewers as set forth above to assert such a claim.

In the absence of any such averments, summary judgment should be granted in favor of the Defendants on Count X.

5. *THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' CRA CLAIMS BECAUSE THEY HAVE FAILED TO ALLEGE IMPROPERLY-MOTIVATED ZONING DECISIONS OF THE TOWNSHIP OR IDENTIFY A "POLICY OR CUSTOM" FURTHERED BY THE DEFENDANTS' ACTIONS.*

■ As we noted at page 315 *supra,* the Plaintiff's CRA claims appear to be based on an assertion that the cumulative effect of all of the Defendants' actions allegedly working to their detriment adds up to a CRA violation. Many of the contentions of specific acts which result in a CRA violation, referenced for the first time in the Plaintiffs' brief in opposition to the Motion, and also referenced at page 315 *supra,* cannot, in our view, either singly or in conjunction with all of the other averments, amount to a CRA violation. These deficiencies are obvious relative to the references to the Township's exercise of the authority to tax the Property and impose liens upon it for the Plaintiffs' failure to make tax payments. These are functions which the Township obviously takes against all of its delinquent property owners. The alleged violations of the terms of the 1964 Lease appear adequately covered by Counts VII and IX. None of these actions by the Township would, in our view, rise to the level of CRA violations.

The claims relating to the Defendants' refusal to rezone the Property for the Plaintiffs' planned residential development and their refusal to allow the Property to be used as a golf driving range bear some resemblance to allegations of substantive due process violations which have been allowed as claims under the CRA in *DeBlasio v. Zoning Board of Adjustment,* 53 F.3d 592, 601–02 (3d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995) (allegations of partisan political purposes for a zoning decision state a claim); *Acierno v. Cloutier,* 40 F.3d 597 (3d Cir.1994) (en banc) (claim

stated where a property was down-zoned after approval of a development plan despite considerable efforts by the developer to rectify problems with the plan); and *Bello v. Walker,* 840 F.2d 1124, 1129–30 (3d Cir.), *cert. denied,* 488 U.S. 854, 868, 109 S.Ct. 134, 176, 102 L.Ed.2d 107, 145 (1988) (allegations of partisan politics and personal animosity to applicant were held sufficient to state a claim). However, the resemblance is faint, because here there *are* no allegations of personal animosity, partisan politics, or an attempt to undo a prior approval of the Plaintiffs' plans. At best, these claims constitute a suggestion, unsupported by any hard facts, that the Defendants led the Plaintiffs to think that rezoning for dense residential development would be permitted and that the Authority then proceeded to deny the application. It appears to us that Zaid, flushed with success on other ventures, expected that his rezoning request would be welcomed with open arms and took a calculated risk that it would be. However, there is no evidence that the Defendants engaged in any actions which caused Zaid to view his rezoning application with such optimism.

█ It is also necessary for the Plaintiffs, in order to state a valid CRA action against a municipality and its agents, to identify a "policy or custom" of that municipality and/or their agents which violated the Plaintiffs' civil rights. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611 (1978); and *In re Wyndmoor Learning Center,* 1992 WL 119367, at *7–*8 (Bankr.E.D.Pa. May 21, 1992). We can discern no allegation of an identifiable policy or custom of the Defendants asserted by the Plaintiffs which resulted in the alleged violations of their rights. Each of the actions of the Defendants which the Plaintiffs, in their brief, assert as support for their CRA claim appear to relate to the Defendants' particular dealings with these particular Plaintiffs, and certainly the cumulative effect is unique to these Plaintiffs.

Thus, the claims set forth in Count XI, far from meeting the requirements set down for such claims in, *e.g., Monell* and *DeBlasio,* appear very similar to those asserted by the

Plaintiff in *U.S. Magnet & Alloy Corp. v. Yardley Borough,* 1986 WL 14550 (E.D.Pa. Dec. 11, 1986). There, the court dismissed a challenge of a denial of a request for a special zoning exception because the plaintiff failed to "identify the policy, attribute it to the municipality, and show that the policy caused the constitutional violation." *Id.* at *1. In granting summary judgment to the defendants, the court held that "[a] federal court, after all, 'should not ... sit as a zoning board of appeals' ... It is not enough simply to give these state law claims constitutional labels such as 'due process' or 'equal protection' in order to raise a substantial federal question under section 1983." *Id.,* citing *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 833 (1st Cir.), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982), quoting in turn *Village of Belle Terre v. Boraas,* 416 U.S. 1, 12, 94 S.Ct. 1536, 1542–43, 39 L.Ed.2d 797 (1974). *See also Cohen v. City of Philadelphia,* 736 F.2d 81, 85 (3d Cir.), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984); and *de Botton v. Marple Township,* 689 F.Supp. 477 (E.D.Pa.1988).

We therefore conclude that, apart from the statute of limitations problems arising from these claims, the Plaintiffs' CRA claims fail to state a cognizable cause of action. Therefore, we recommend that the Motion be granted as to the claims set forth in Count XI of the Complaint.

6. *THE NUISANCE CLAIMS OF THE PLAINTIFFS WHICH SURVIVED DISMISSAL ON THE GROUND OF LIMITATIONS ARE OTHERWISE MAINTAINABLE BY THE PLAINTIFFS.*

█ We next consider the Defendants' arguments that, as in the case of the Plaintiffs' CRA claims, we should dismiss the Plaintiffs' nuisance claims entirely because they fail to state a recognizable claim, irrespective of the limitations issue regarding these claims. The Defendants are correct in suggesting that the historical role of private nuisance law is to efficiently resolve conflicts arising from discordant land uses among neighboring landowners. *See Philadelphia*

*Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 314 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). There are, however, exceptions to that rule. Section 821E of 4 RESTATEMENT (SECOND) OF TORTS at 102–03 ("4 Restatement"), states that parties who are entitled to bring an action for a private nuisance include

(a) possessors of the land,

(b) owners of easements and profits in the land, and

(c) owners of nonpossessory estates in the land that are detrimentally affected by interference with its use And enjoyment.

In *Graham Oil Co. v. BP Oil Co.,* 885 F.Supp. 716 (W.D.Pa.1994), the court held that a landlord had a valid claim for private nuisance against a tenant despite the traditional belief that the doctrine of private nuisance applied only to adjoining landowners. *Id.* at 724. The court relied on the Restatement as well as on *Arawana Mills Co. v. United Technologies Corp.,* 795 F.Supp. 1238 (D.Conn.1992), which held that tenants can be held liable for injuries to third parties caused by nuisance on leased property.

The relationship between the Plaintiffs and the Township can be classified as a landlord-tenant relationship. The Township was a former tenant on the Property and, according to the terms of the 1964 Lease, was still to be a lessee of the Property from the Authority for several years after the Plaintiffs purchased the Property. The Plaintiffs, as purchasers of the Property, allegedly succeeded to the Authority's rights. It therefore follows that a claim sounding in private nuisance could be properly brought by the Plaintiffs against the Township.

■ Even if we were to focus on the relationship between the Authority and the Plaintiffs, as buyer-seller, and not the Plaintiffs–Township relationship of owners-lessee, we still conclude that an action for private nuisance may be maintained. In *Hercules, supra,* the district court held that, *absent fraudulent concealment,* a purchaser of land could not pursue a private nuisance action against the vendor due to the *caveat emptor* doctrine. The court reasoned that the pur-chaser bought the land in an open, arm's length transaction, without concealment, and must be held to have calculated the risk of future clean-up costs into the amount it was willing to pay for the land. In the present case, however, the Plaintiffs *have* alleged fraudulent concealment on the part of the Defendants and this claim is among those which have survived the Motion. *See* pages 315–16 *supra.* We therefore conclude that *caveat emptor* does not apply in this case, and a private nuisance action may be maintained by the Plaintiffs against the Authority.

■ A public nuisance differs from a private nuisance. A public nuisance is defined as "an unreasonable interference with a right common to the general public." 4 Restatement, *supra,* § 821B(1), at 87. The *Hercules* court held that private individuals may not recover damages in an individual action for public nuisance unless they have suffered harm of a different kind from that suffered by the general public. 762 F.2d at 315–16. *See also* 4 Restatement, *supra,* § 821(C)(1), at 94. In *Hercules* the plaintiff did not allege that it suffered a harm different from that suffered by the general public. There, the public harm was the interference with the right of access to pure water in the Delaware River. The court stated that the plaintiff was not uniquely harmed because it was "not a case where an established business made commercial use of the public right with which the defendant interfered." *Id.* at 316.

In the instant case, the Plaintiffs alleged, in the Complaint, that the Defendants caused the pollution of the soil and groundwater in and around their particular Property. It can be safely assumed that, in such an action for public nuisance, the Plaintiffs are alleging interference with the public's right to uncontaminated soil and/or water. As such, the Plaintiffs' claim for public nuisance is proper under *Hercules.* Moreover, the Plaintiffs argued that they have suffered harm different from that of the general public. The Plaintiffs clearly intended to make commercial use of the soil and groundwater on the premises where the nuisance is alleged to exist. Injuries resulting from the Defendants' alleged

interference with the soil and groundwater were thus unique to the Plaintiffs. An action for public nuisance, to the extent that it is not barred by limitations, is hence proper. Summary judgment can therefore not be granted as to all of the claims as set forth in Count IV of the Complaint.

### 7. THE DEFENDANTS' ASSERTION OF GOVERNMENTAL IMMUNITY AS TO THE REMAINING CLAIMS MUST BE REJECTED.

 The Defendants assert governmental immunity, on the basis of applicable state law, 42 Pa.C.S. § 8541, contending that the Plaintiffs' claims do not fall within any of the exceptions set forth in 42 Pa.C.S. § 8542. Initially, we would observe that 42 Pa.C.S. § 8542(b)(3), creating an exception for actions based on "[t]he care, custody or control of real property in the possession of the local agency," appears to abrogate governmental immunity for all or most of the Plaintiffs' remaining claims, which arise from the Defendants' status as a seller and a tenant of land, respectively, and not from the exercise of any governmental functions. Secondly, we note that the breach of lease claims are contractual in nature, and not subject to immunities arising under state law relating to a municipality's tort liability. *Compare* 25 P.L.E. 462–65 (1960) (municipality liable for breaches of contract), *with* 25 P.L.E. (Pocket Part) 146 (1995) (42 Pa.C.S. §§ 8541, 8542 limit municipal liability for torts).

However, most importantly, we note that the Bankruptcy Code was amended in 1994 to provide, at 11 U.S.C. § 106(a)(1), that

[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections ... 502, ... 506, ... 542 ... [and] 544, ...

 The first twelve (12) Counts of the Complaint clearly state complex claims, mostly arising pre-petition, against the Defendants. As such, these claims are non-core, related claims arising under 11 U.S.C. §§ 542(a), (b), 544. *See Beard v. Braunstein*, 914 F.2d 434, 443–45 (3d Cir.1990); and *In re A.I.A. Industries, Inc.*, 75 B.R. 1013, 1016–20 (Bankr.E.D.Pa.1987).[4] Count XIII and XIX are clearly core proceedings under 11 U.S.C. §§ 502, 506.[5] Therefore, to the extent the sovereign immunity may arise in favor of the Defendants under otherwise applicable nonbankruptcy law, it is abrogated under § 106(a)(1).[6]

### D. CONCLUSION

As we indicated in *Rosco I, supra,* at *2 n. 2, we believe that, whenever we conclude that we should grant any substantial aspects of a summary judgment motion in a non-core proceeding, we must issue our rulings in the form of a Report and Recommendations to the District Court, pursuant to F.R.B.P. 9033. We therefore have prepared our decision in the form of a Recommendation that the District Court grant the Motion as to Counts I, II, III, VI, VIII, X, XI, and certain aspects of Counts IV, V, and XII, while allowing Counts VII, IX, XIII, and XIV and certain aspects of Counts IV, V, and XII to proceed. Also, a status hearing is scheduled in reference to the Proceeding on May 1, 1996, which is also the date of the confirmation hearing on the Debtor's Plan. It is apparent that the foregoing significant Recommendations regarding the claims in the Proceeding could impact the feasibility of the

---

4. As a result, this court cannot conduct a jury trial on the remaining claims unless all of the parties consent thereto. *See* 28 U.S.C. § 157(e); and *Beard, supra,* 914 F.2d at 442–43.

5. We believe that the predominance of the non-core claims would preclude our conducting a non-jury trial as to any portion of this Proceeding.

6. The Defendants also argue that Zaid is not a proper party to this action, because the Debtor and not Zaid was the purchaser of the Property and Zaid is a non-debtor. The fact that Zaid is a non-debtor would not preclude his joinder in the Proceeding, since his claims are related to those made by the Debtor which clearly are very significant to its bankruptcy case. *See In re Mosley,* 85 B.R. 942, 948 (Bankr.E.D.Pa.1988). It seems to make little sense to sort apart potential claims of the Debtor from those of Zaid at this juncture, but rather to allow him to remain as a Plaintiff in the Proceeding and avoid possible multiple litigation of identical issues in different forums.

.. 

Plan. At that time, this court will review how the parties wish the remaining claims to be resolved, and how the Debtor wishes to proceed on the Plan. We urge that, prior to the conference, the parties consider submission of the remaining matters to our court-annexed mediation program, hopefully also choosing a mediator to further resolution of the remaining issues.[7]

Dated at Philadelphia, PA, this 25th day of April, 1996.

## MEMORANDUM

On April 25, 1996, this court issued a comprehensive Report and Recommendations of Bankruptcy Judge Sur Defendants' Motion for Summary Judgment, ("the Report"), which was intended to dispose of all of the issues pending before this court in the above-captioned proceeding ("the Proceeding") at that time. On May 6, 1996, JOSHUA HILL, INC. ("the Debtor") and MARC Z. ZAID (with the Debtor, "the Plaintiffs") filed and served a motion requesting that we reconsider certain aspects of that Report ("the Motion").

Central to many of the issues addressed in the Report was our conclusion that the claims of the Plaintiffs which sounded in contract (Claim III—Rescission and Restitution; Claim VI—Breach of Contract; and Claim VIII—Fraudulent and Negligent Misrepresentation) were subject to the four-year statute of limitations referenced in 42 Pa.C.S. § 5525. Report, at 309–13. The Plaintiffs claim that the proper limitations period for such claims is either the twenty-year period for contracts under seal, pursuant to 42 Pa. C.S. § 5529(b)(1), or the five-year period for certain real estate claims, pursuant to 42 Pa.C.S. § 5526(2).

In addition, the Plaintiffs argue that their contractual claims should not be deemed to have accrued until their causes of action (Claim VII—Ground Rents, and Claim IX—Breach on Lease) based on a 1964 lease ("the 1964 Lease") of the property in issue ("the Premises") to Defendant WHITEMARSH TOWNSHIP ("the Township"), were discov-

ered, which we found, in holding that limitations had not run as to these claims, to have occurred in 1993. Report, at 316.

 The pertinent Pennsylvania statutes provide as follows:

### § 5525. Four year limitation

The following actions and proceedings must be commenced within four years:

> (1) An action upon a contract, under seal or otherwise, for the sale, construction or furnishing of tangible personal property or fixtures.

> . . . . .

> (8) An action upon a contract, obligation or liability founded upon a writing not specified in paragraph (7) [relating to actions on bonds], under seal or otherwise, except an action subject to another limitation specified in this subchapter.

### § 5526. Five year limitation

The following actions and proceedings must be commenced within five years:

> . . . . .

> (2) An action for specific performance of a contract for sale of real property or for damages for noncompliance therewith.

### § 5529. Twenty year limitation

> . . . . .

> (b) Instruments under seal.—

> (1) notwithstanding section 5527 (relating to six year limitation), an action or proceeding upon an instrument in writing under seal must be commenced within 20 years.

> (2) This subsection shall expire June 27, 1998.

The Plaintiffs correctly cite to *Romeo & Sons, Inc. v. P.C. Yezbak & Son, Inc.*, 421 Pa.Super. 333, 617 A.2d 1320 (1993) ("*Romeo I*"), *aff'd*, 539 Pa. 390, 652 A.2d 830 (1995) ("*Romeo II*"), for the proposition that 42 Pa.C.S. § 5525(1) was incorrectly referenced as controlling, Report, at 310, 316, because

---

7. The parties should call this court's Courtroom Deputy, Pamela Blalock, at 215–597–0990, to obtain the names of those mediators on our panel which have not been overworked and are hence recommended as available.

that section governs disputes concerning contracts for the sale of personalty and does not apply to contracts for sale of real estate. However, we are now convinced that the proper reference would have been to 42 Pa. C.S. § 5525(8), the residual statute of limitation on contractual claims, and not to 42 Pa.C.S. § 5529(b)(1) or 42 Pa.C.S. § 5526(2), as contended by the Plaintiffs.

Beginning with § 5529, we note that, at least until June 27, 1998, a twenty-year statute of limitations governs all actions involving contracts under seal.[1] Although the utility of the seal has long since vanished,[2] and this limitation period will vanish in about two years as well, recent case law has reaffirmed the continuing viability of the seal and the special rules which govern the limitations of actions based on such instruments. *See, e.g., Dailey, supra,* 434 Pa.Super. at 639–40, 644 A.2d at 789–91; and *Klein, supra,* 282 Pa.Super. at 336, 422 A.2d at 1144.

■ However, there is a separate line of cases regarding *corporate* seals, which we find is highly pertinent to the matter before us. Because corporations generally can only execute instruments through their officers, directors, or other authorized persons, the use of a corporate seal has evolved as a method of demonstrating the signor's authority to bind the corporation and as a method of establishing authenticity. *See Dailey, supra,* 434 Pa.Super. at 640, 644 A.2d at 791; *Coleman v. Pittsburgh Coal Co.,* 158 Pa.Super. 81, 84 & n. 1, 43 A.2d 540, 541 & n. 1 (1945); *Winter v. Colonial Land Co.,* 61 Pa.Super. 215, 217–19 (1915); *Penn–Delco Union School Dist. Authority v. M. & L. Construction Co.,* 60 D. & C.2d 226, 231 (Delaware Co. C.P.1972); and *Lundvall, supra,* 58 D. & C.2d at 647. However, affixation of a *corporate* seal does not make the

instrument one *under seal* (otherwise known as a "specialty"). *See Coleman, supra,* 158 Pa.Super. at 84 & n. 1, 43 A.2d at 541–42 & n. 1; *Winter, supra,* 61 Pa.Super. at 217–19; *Penn–Delco, supra,* 60 D. & C.2d at 231; and *Lundvall, supra,* 58 D. & C.2d at 647. Generally, other evidence of a specialty is required, such as a contractual provision stating that the parties intend to execute the instrument as one under seal or a recital which indicates that both a signature and seal follow. *See Coleman, supra,* 158 Pa.Super. at 84 n. 1, 43 A.2d at 541–42 n. 1; and *Winter, supra,* 61 Pa.Super. at 217–19.

■ The parties' Agreement of Sale of June 3, 1987, in issue ("the A/S") contains only the corporate seal of Defendant WHITEMARSH TOWNSHIP AUTHORITY ("the Authority"). There is no actual seal or pre-printed device after the signature of Zaid. Although a single seal can be adopted by all signatories to a contract, *see Loraw, supra,* 156 Pa. at 331, 27 A. at 242; and *Lundvall, supra,* 58 D. & C.2d at 647, there is no indication that the parties to the instant A/S so intended. The seal on the A/S is specifically indicated by the words "(Corporate Seal)" printed under the signature line of the Authority's secretary. Furthermore, the seal clearly contains the corporate name of the Authority only. There is nothing to suggest that Zaid intended to adopt this single seal as his own as well, an issue on which the Plaintiffs bear the burden of proof. *See Lundvall, supra,* 58 D. & C.2d at 648–49. The seal is not even appended to the signature of the Authority's signatory, but is rather imposed over the signature of the Authority's witness. The recital which introduces the signatures indicates that the parties intended to execute the A/S, but there is no

---

1. Formerly, actions on a contract under seal were not subject to any period of limitations, *see Parsons Trading Co. v. Dohan,* 312 Pa. 464, 471, 167 A. 310, 313 (1933), although a presumption of payment arose after 21 years. *See Transbel Investment Co. v. Scott,* 344 Pa. 544, 546, 26 A.2d 205, 207 (1942); and *Lundvall v. Camp Hill School Dist.,* 58 D. & C.2d 643, 645 (Cumberland Co. C.P.1972).

2. *Loraw v. Nissley,* 156 Pa. 329, 330, 27 A. 242, 242 (1893) ("The days of actual sealing of legal documents, in its original sense of the impression

of an individual mark or devise upon wax or wafer, or even on the parchment or paper itself, have long gone by."). *See also Beneficial Consumer Discount Co. v. Dailey,* 434 Pa.Super. 636, 637–38, 644 A.2d 789, 790, *appeal granted,* 539 Pa. 636, 650 A.2d 51 (1994), *appeal dismissed,* 540 Pa. 48, 655 A.2d 505 (1995); *Klein v. Reid,* 282 Pa.Super. 332, 336, 422 A.2d 1143, 1144 (1980); and *Associates Consumer Discount Co. v. Gabriel,* 72 D. & C.2d 687, 689 (Allegheny Co. C.P.1974).

indication that they intended the agreement to be sealed. We therefore conclude, without hesitation, that the Authority's seal is a corporate seal of authentication, and that there is no evidence that the parties intended to make the A/S a specialty. Consequently, 42 Pa.C.S. § 5529 does not apply.

The potential application of 42 U.S.C. § 5526(2) to the instant contract is a more difficult issue. These difficulties arise from the history of the enactment of the various Pennsylvania statutes of limitations, featuring piecemeal amendments which have resulted in something less than a tightly-locking series of statutes.

Contractual claims have historically been subject to a six-year statute of limitations originally appearing in 12 P.S. § 31 (repealed), enacted in 1713. *See Sherwin v. Oil City Nat'l Bank,* 18 F.R.D. 188, 194 (W.D.Pa. 1955), *aff'd,* 229 F.2d 835 (3d Cir.1956); *Parsons Trading, supra,* 312 Pa. at 471, 167 A. at 313; and *DeMatteo v. White,* 233 Pa.Super. 339, 336 A.2d 355 (1975). When 12 P.S. § 31 was repealed, the six-year limitation on written contract suits was incorporated into 42 Pa.C.S. 5527(2). *See* Source Note to 42 Pa.C.S. § 5527(2) (1980). At the time, that provision read: "The following actions and proceedings must be commenced within six years: ... An action upon a contract, obligation or liability founded upon a bond, note or other instrument in writing, except an action subject to another limitation specified in this subchapter." *Id. See also Romeo II, supra,* 539 Pa. at 393, 652 A.2d at 831; and *Ragnar Benson, Inc. v. Bethel Mart Associates,* 308 Pa.Super. 405, 414, 454 A.2d 599, 603 (1982). In 1982, possibly to conform with the shorter limitations period appearing in the Uniform Commercial Code, 13 Pa.C.S. § 2728, this limitation period was shortened to four years and written into § 5525(8). *See Luden's, Inc. v. Irwin & Leighton, Inc.,* 28 D. & C.3d 565, 578 (Montgomery Co. C.P. 1983). Also, in 1982, § 5527 was altered to provide for only a very general six-year catch-all limitation applicable to all civil litigation not otherwise controlled by a more specific limitation.

As a result, contractual claims are now generally limited by the four-year limitation period found in § 5525(8). *Accord, Packer Society Hill Travel Agency, Inc. v. Presbyterian Univ. of Pa. Medical Center,* 430 Pa.Super. 625, 629–30, 635 A.2d 649, 652 (1993); and *Luden's, supra,* 28 D. & C.3d at 578.

The Supreme Court's decision in *Romeo II* supports this conclusion. Although the Supreme Court did not, in *Romeo II,* reverse the Superior Court's determination that the contract dispute involving real property in that case, arising in 1979, was subject to a six-year limitation, the Supreme Court did take issue with the Superior Court's dicta suggesting that six years is the appropriate limitation for such contract disputes today. Specifically, the Supreme Court stated, *Romeo II,* 539 Pa. at 391, 393, 394, 652 A.2d at 831, 832, 833 (footnotes omitted, emphasis in the original):

> The Superior Court, although correctly applying a six-year limitation period, erroneously concluded that 42 Pa.C.S. § 5527 (1982) controls this scenario. Rather, 42 Pa.C.S. § 5527(2) (1980), before its amendment in 1982, governs the instant claim. . . .
>
> [W]e affirm the Superior Court's conclusion that Romeo's complaint is not barred by the statute of limitations, but write to clarify the court's application of 42 Pa.C.S. § 5527 (1982) to the instant facts. . . .

We note the Superior Court, in analyzing this case under the *current* statutory scheme concluded that section 5527, as amended in 1982, provides the appropriate period of limitation for written construction contract scenarios. . . . Because the facts of this case do not implicate the current statutory scheme for limitations of actions, we express no opinion regarding the wisdom of the Superior Court's conclusion.

■■■ We therefore may safely conclude that claims arising from written contracts generally, including those concerning real property, are governed by the four-year limitation period of § 5525(8). However, it must be noted that § 5525(8) contains an exception for actions governed by a more specific provision. The possibility of a more specific provision requires us to address the application of 42 Pa.C.S. § 5526(2), which the Plaintiffs

argue governs their instant contractual claims. Although the case at hand rather obviously does not involve an action for specific performance, the Plaintiffs argue that the Authority's alleged breach of covenants in the A/S constitutes the type of "noncompliance" also covered by § 5526(2). Although there is no clear authority on this proposition either way, we disagree with the Plaintiffs' interpretation of § 5526(2).

The historical purpose of § 5526(2) and its predecessors is to "assure greater certainty of title and make more secure the enjoyment of real estate." *See generally* 2 STANDARD PA.PRACTICE, § 13:150, at 568 (1994). *See also, e.g., Proctor v. Sagamore Big Game Club*, 265 F.2d 196, 202 (3d Cir.), *cert. denied*, 361 U.S. 831, 80 S.Ct. 81, 4 L.Ed.2d 73 (1959); and *Ross·v. Suburban Counties Realty Corp.*, 356 Pa. 126, 129, 51 A.2d 700, 701 (1947). Thus, questions concerning title to real estate are at the heart of those disputes governed by § 5526(2). Certainly, the inclusion of actions for specific performance is consistent with this interpretation. *See, e.g., DeAngelis v. Newman*, 350 Pa.Super. 536, 543–44, 504 A.2d 1279, 1283 (1986). We therefore believe that, when this statute speaks of "an action ... for damages for noncompliance therewith," it is meant to cover a situation where the vendor refused to transfer title and, for some reason, only money damages, as opposed to specific performance, are available to the vendee. Under this interpretation, § 5526(2) applies only to a situation where the vendor's inability or refusal to transfer good title to the vendee is in issue. *Cf. Hostetter v. Hoover*, 378 Pa.Super. 1, 9 n. 2, 547 A.2d 1247, 1251 n. 2 (1988) ("The statute of limitations requires that an *action to enforce a contract for the sale of real estate* be brought within five years.") (emphasis added).[3]

The Plaintiffs' complaint is not that they received bad title or no title at all to the Premises. Rather, the Plaintiffs claim that certain covenants of an A/S to purchase the Premises were breached by the Authority which, when discovered, indicated to them that the title which was transferred was not as valuable as they had expected. This is a contract issue, not a real property issue, and should be governed by § 5525(8), which pertains to all actions on written contracts.

Finally, we again turn to *Romeo II* for additional support. As pointed out by the plaintiff, the *Romeo* decisions involved a written contract for construction of a building on real estate. *Romeo II*, 539 Pa. at 391, 652 A.2d at 831. Like the A/S at issue here, the breach of contract in the *Romeo* case did not involve issues of title. Although the Superior Court and the Supreme Court disagreed on what version of the statute of limitations applied, they agreed that the contract in issue in *Romeo* was a real estate contract and that it was controlled by the applicable statute governing written contract disputes. *Romeo I*, 421 Pa.Super. at 335–36, 617 A.2d at 1322; and *Romeo II*, 539 Pa. at 392 & n. 3, 652 A.2d at 831–32 & n. 3. No mention of § 5526(2) or its predecessors appears in either of the *Romeo* decisions.

Having concluded that the Report correctly concluded, though based on the wrong precise statutory provision, that a four-year limitation period applies to the Plaintiffs' contractual claims, we need only address the Plaintiff's contention regarding the significance of their belated (1993) discovery of the 1964 Lease.

Our position, simply stated, is that we have not perceived one shred of evidence in the record indicating that the existence of the 1964 Lease in any way detrimentally affected the Plaintiffs' use of the Premises. The Plaintiffs presented Claims VII and IX of their Complaint as asserting a distinct claim for rent, in their capacity as lessor under the

---

3. This interpretation is also consistent with the rule of statutory construction known as *noscitur a sociis* ("it is known from its associates"):

If the legislative intent or meaning of a statute is not clear, the meaning of doubtful words may be determined by reference to their relationship with other associated words and phrases. Thus, when two or more words are grouped together, and ordinarily have a similar meaning, but are not equally comprehensive, the general word will be limited and qualified by the special word.

2A H. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 47.16, at 183 (5th ed. 1992).

1964 Lease, as requesting additional damages, apart from their claims of breaches of promises and warranties in the A/S which also gave rise to damages. Nor have the Plaintiffs suggested any cause-and-effect relationship between the existence of the 1964 Lease and the damages resulting from alleged breaches of the A/S in the Memorandum of Law incorporated within the Motion.

The issue may thus be stated as one of "proximate cause." *See Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 F.2d 1274, 1284 (3d Cir.1992); and *In re Direct Satellite Communications, Inc.*, 96 B.R. 507, 515–16 (Bankr.E.D.Pa.1989). The Plaintiffs have not shown, nor is this court inclined to find, that the presence of the 1964 Lease was a substantial factor in bringing about any of the alleged harm inflicted upon the Plaintiffs by the Defendants' alleged actions. Rather, it appears to us that the 1964 Lease was effectively abandoned by the Township, forgotten by the Authority, and has played no role whatsoever in the Plaintiffs' efforts to develop the Premises and their lack of success in doing so.

We also reiterate that the Report, at 311–12, emphasized that the accrual of the Plaintiffs' contractual cause of action, in June 1989, occurred not by reason of their having obtained all information relative to the Premises by that date, but from their proven access, at that time, to sufficient information to put them on notice of the nature of the Defendants' alleged misrepresentations in the A/S. The Plaintiffs' knowledge of the existence of the 1964 Lease, had, in our opinion, no bearing on the nature of the Defendants' alleged misrepresentations. We will therefore proceed to deny the Plaintiffs' within Motion.

In bringing all matters relevant to the Proceeding up to date, we should note that, on May 1, 1996, the Plaintiffs' Plan of Reorganization was confirmed. In light of a colloquy with counsel on May 15, 1996, in which we entertained argument on the Motion and considered other matters relevant to the Proceeding, we are at this time appointing John Adam Kerns, Jr., Esquire, chosen by the parties from our list of mediators under this court's mediation program, to attempt to resolve the entire dispute between the parties before its reference to the district court for a jury trial on the Plaintiffs' remaining claims. *See* Report, at 323–24 & nn. 5, 6. A status hearing to obtain a report on the mediator's efforts to date is scheduled on June 26, 1996. A motion to formally consolidate the instant proceeding with the parallel removed state court proceeding, *see id.* at 305–06, will be deferred for resolution by the trial court. A motion of the Plaintiffs to expand discovery, filed on May 14, 1996, will be deferred pending mediation and listed with the status hearing on June 26, 1996.

An Order incorporating all of the foregoing rulings will be entered.

Dated at Philadelphia, PA, this 22nd day of May, 1996.